JOHN PETERS, AND JOHN PETERS, JR., PLAINTIFFS, *vs.* THE WARREN INSURANCE COMPANY, DEFENDANTS.

Insurance. Insurance was made to the amount of eight thousand dollars on the ship Paragon, for one year. The policy contained the usual risks, and among others, that of the perils of the sea. The assured claimed for a loss by collision with another vessel, without any fault of the master or crew of the Paragon; and also insisted on a general average and contribution. The Paragon was in part insured; and in November, 1836, in the year during which the policy was in operation, she sailed from Hamburgh, in ballast, for Gottenburgh, for a cargo of iron, for the United States. While proceeding down the Elbe, with a pilot on board, she came in contact with a galliot, and sunk her. She lost her bowsprit, jib-boom, and anchor, and was otherwise damaged, and put into Cuxhaven, a port at the mouth of the Elbe, and in the jurisdiction of Hamburgh. The captain of the galliot libelled the Paragon, alleging that the loss of his vessel was caused by the carelessness or fault of those on board the Paragon. Upon the hearing of the cause, the Court decided that the collision was not the result of the fault or carelessness of either side; and that therefore, according to the marine law of Hamburgh, the loss was a general average loss, and to be borne equally by both parties; that is, that the Paragon was to bear one-half of the expense of her own repairs, and to pay one-half of the value of the galliot; and that the galliot was to bear the loss of the half of her own value, and to pay one-half of the repairs of the Paragon. The result of this decree was, that the Paragon was to pay two thousand six hundred dollars, being one-half of the value of the galliot, (three thousand dollars,) after deducting one-half of her own repairs, being four hundred dollars. The owners of the Paragon, having no funds in Hamburgh, the captain was obliged to raise the money on bottomry. There being no cargo on board the Paragon, and no freight earned, the Paragon was obliged to bear the whole loss. Held, that the assured were entitled to recover.

A loss by collision, without any fault on either side, is a loss by the perils of the sea, within the protection of the policy of insurance. So far as the injury and repairs done to the Paragon itself extend, the underwriters are liable for all damages.

The rule, that underwriters are liable only for losses arising from the proximate cause of the loss, and not for losses arising from a remote cause, not immediately connected with the peril, is correct; when it is understood and applied in its true sense: and as such, it has been repeatedly recognised in this Court.

The law of insurance, as a practical science, does not indulge in niceties. It seeks to administer justice according to the fair interpretation of the intention of the parties; and deems that to be a loss within the policy which is a natural and necessary consequence of the peril insured against.

If there be any commercial contract which more than any other requires the application of sound common sense and practical reasoning in the exposition of it, and in the uniformity of the application of rules to it, it is certainly a policy of insurance.

It has been held by learned foreign writers on the law of insurance, that whenever the thing insured becomes by law directly chargeable with any expense, contribution, or loss, in consequence of a particular peril; the law treats the peril, for all practical purposes, as the proximate cause of such expense, contribution, or loss. This they hold, upon the general principles of law, applicable to the contract of insurance. In the opinion of the Supreme Court, this is the just sense and true interpretation of the contract.

In all foreign voyages, the underwriters, necessarily, have it in contemplation that the vessel insured must, or at least may be, subjected to the operation of the laws of the foreign ports which are visited. Those very laws may in some cases impose burdens, and in some cases give benefits, different from our laws; and yet there are cases under policies of insurance, where it is admitted the foreign law will govern the rights of the parties, and not the domestic law. Such is the known case of general average, settled in a foreign port according to the local law; although it may differ from our own law.

ON a certificate of division from the Circuit Court of the United States, for the District of Massachusetts.

[Peters *vs.* The Warren Insurance Company.]

This was a case on a policy of insurance, dated the 1st of April, 1836, whereby the defendants insured the plaintiffs, for whom it may concern, payable to them, eight thousand dollars on the ship Paragon, for the term of one year, commencing the risk on the 15th day of March, 1836, at noon, at a premium of five per cent. The declaration alleged a loss by collision with another vessel, without any fault of the master or crew of the Paragon; and also insisted on a general average and contribution.

The parties agreed that the verdict should be rendered by the jury for the plaintiff or for the defendants, according to the opinion of the Court, upon the matters of law arising upon the following statement of the facts of the case. The plaintiffs are the owners of the ship Paragon, insured by the defendants in part.

On the 10th of November, 1836, the vessel sailed from Hamburgh, in ballast, for Gottenburgh, to procure a cargo of iron, for the United States.

Whilst proceeding down the Elbe, with a pilot on board, she came in contact with a galliot called Frau Anna, and sunk her. The Paragon lost her bowsprit, jib-boom, and anchor, and sustained other damages, which obliged her to go into Cuxhaven, a port at the mouth of the Elbe, and subject to the jurisdiction of Hamburgh, for repairs.

Whilst lying there, the captain of the galliot libelled the Paragon in the Marine Court, alleging that the loss of the vessel was caused by the carelessness or fault of those on board the Paragon. The ship was arrested; but subsequently released on security being given by the agents of the owners, to respond to such damages as should be awarded by the Court.

The captain of the Paragon, in his answer, denied the charges of carelessness or fault on the part of those on board of his ship; and the Court, after hearing the parties and their proof, decided that the collision was not the result of fault or carelessness on either side; and that therefore, according to article first, title eighth, of the Marine Law of Hamburgh, the loss was a general average loss, and to be borne equally by each party: that is, the Paragon was to bear one-half of the expense of her own repairs, and to pay one-half of the value of the galliot; and the galliot was to bear the loss of one-half of her own value, and to pay one-half of the expense of the repairs of the Paragon. In conformity with this decision, a general average statement was drawn up by Mr. Oldermann, the Despacheur of Hamburgh; an officer appointed by law, and by whom alone such statements can be prepared.

In this statement are charged, first, the expenses of repairing the Paragon, after making the deduction of one-third new for old, saving one of her anchors and chains, which was lost at the time of the collision; wages and provisions of the captain and the crew, during the detention, and the expenses of surveys, protest, defending the suit, &c., amounting in all to about eight hundred dollars, and one-half of which is charged to the Paragon, and one-half to the galliot.

Secondly, are charged the value of the galliot, as by appraisal under an order of Court, of her freight and cargo, the expenses of surveys, protest, prosecuting the suit, &c., amounting in all to about six thousand dollars, one-half of which is to be charged to the Paragon.

The statement concludes thus: "Which according to the before mentioned ordinance relating to insurance and average, is to be borne by ship, cargo, and freight, as general average. The ship Paragon has to claim from the Frau Anna, for half the damages, say - - - - - - - $400
And the Frau Anna from the Paragon, one-half the da-
mages, say - -, - - - $3,000
So that the Paragon must pay - - - - $2,600"
Which amount the Tribunal of Commerce decreed should be paid instanter.

The owners of the Paragon, having no funds in Hamburgh, the Captain was obliged to raise the money on bottomry.

There being no cargo on board of the Paragon, and no freight earned, the ship has to bear the whole of the general average loss.

The judges of the Circuit Court were opposed in opinion on the following point and question, viz. "whether, in this case, the contributory amount paid by the Paragon on account of the collision, was a direct, positive, and proximate effect from the accident, in such sense as to render the defendants liable therefor upon this policy."

And on the point and question aforesaid, at the request of the defendants, the same was stated by the said judges, and under their direction as aforesaid, it was ordered to be certified under the seal of the said Circuit Court to the Supreme Court of the United States, at their next session, to be by the said Court finally decided.

The case was submitted to the Court on printed arguments by Mr. Webster for the plaintiff; and Mr. Theophilus Parsons for the defendants.

Mr. Parsons for the defendants.

The principal question in this case is, whether the amount paid on account of the collision between the vessels, is a direct, positive, and proximate effect from the accident.

We do not undertake to say that there are no contracts in which the remota causa spectatur, but certainly the law of insurance looks only at the proximate cause. Is the collision, then, in this case, a remote, or a proximate cause? If the law of Hamburgh is the proximate cause, and the collision the remote cause, then we are clearly discharged; because we do not insure against the law of Hamburgh, nor against any remote cause. But we do insure against collision, and the question, therefore, now takes this shape: is the law of Hamburgh, with its requirement of contribution, to be taken as a part of the act of collision?

[Peters *vs*. The Warren Insurance Company.]

If these questions are to be settled rather by the common sense than by the metaphysics of the law, then it would seem to be clear, that the collision here is the remote cause; for another cause, to wit, the law of Hamburgh, comes between the collision and the contribution; and not only so, but it is this law which actually causes the contribution. The collision, then, is not the proximate cause, for that is proximate which lies nearest; and here another cause is interposed, and thus lies nearer.

How are the authorities? In this country it is a new question, and there are no cases which bear very strongly upon it. But in England, just this question occurred very recently, and was fully reported in the fourth volume of Adolphus and Ellis, p. 420, De Vaux *vs*. Salvador. This case, interesting both from its novelty and its importance, was fully considered, first, by Lord Denman, and then by the Court of Queen's Bench, on a motion for a new trial; and the decision was fully and pointedly for the defence, on precisely the grounds we have taken here. Nothing can be more exact than the analogy between that case and this; nothing more precise and definite; and as we think, nothing can be more reasonable, than the principles upon which this case is decided in England. Will this Court decide precisely the same case, on precisely opposite grounds? Some of the continental authorities may seem to be against us. But, not to dwell on the circumstance, that their whole "doctrine of contract" rests upon the civil law, and that the difference, in this respect, between their law and ours, greatly weakens their authority, as precedents for us; not to dwell on this; it is very important to remember, that they, as Emerigon and the rest, decide that insurers shall repay the contribution; but they decide under the influence of the law which requires the contribution. That is, on the continent, generally perhaps, a rule like that of Hamburgh, dividing the loss from collision, between two innocent vessels, prevails. To the continental writers it is familiar; they are accustomed to the law, and to all the usages going with the law, which law is perfectly well known there by everybody; and it is very natural that they should hold insurers liable for the contribution, as if it were a component part of the collision: very natural, and perhaps, very right. Not so, with the English Courts, or our own: for here the law so dividing this loss, is unknown; we have none here, and our citizens make their bargains under no such contemplation; and therefore, the Courts of England decide rightly there, and our Courts should decide like those of England, and unlike the continental writers, because our laws and usages are like those of England, in respect to the liabilities of vessels in cases of collision, and unlike those of the continent. And our laws in respect to the liabilities of the vessels being alike, so should our laws be in respect to the obligations and implied contracts of insurers, in regard to that contract. We insured against damage to the Paragon; but we did not insure against damage to any other vessel.

But there is another view of this subject, which seems to us per-

fectly decisive The continental authorities not only decide under the influence of their laws, but their policies differ from ours in this precise particular. They all contain, in the enumeration of the risks, " accidental running foul." A French policy is in this form, and the Court are respectfully referred to it. In this policy, the phrase is, " abordage fortuit;" and phrases of similar import are in the policies of Amsterdam and Hamburgh; which are all the continental policies we have seen.

From this it will be obvious, that the only authority where policies like our own were before the Court—that is, the high authority of the English Courts—is directly and most explicitly adverse to the claim of the plaintiffs. While the continental authorities, when they seem to favour it, are adjudicating upon policies which differ from ours in this precise respect, they refer to policies which, unlike ours, provide expressly for this very case. It would seem, therefore, that the force of these continental authorities is at once annihilated.

The rule, causa proxima non remota spectatur, is stronger in England than on the continent; stronger here than in England: the Supreme Court at Washington having settled it repeatedly and firmly. See Petapsco Insurance Company *vs.* Coulter, 3 Peters, 222. Also, Columbian Insurance Company *vs.* Lawrence, 10 Peters, 507. Also, Waters *vs.* Merchants' Louisville Insurance Company, 11 Peters, 213.

But let us look at these foreign authorities more closely.

The ordinances which make the insurers liable are the same which require equal contribution in the case of collision without fault. And this may be right. Thus, in the Modern Code of Commerce, in France, article 50 touches the insurer; article 407 regulates the effects of collision. This is right. The liability of the insurer should be conterminous with the liability of an innocent vessel. Where an innocent vessel is held by law liable for half the injury of collision, there the insurer should be held to make it good. But nowhere else. It seems, however, that a very serious question exists in France, as to the liability of insurers to pay for damages, where the collision arises from a fault which cannot be clearly put upon either party: and this doubt has arisen from the fact that the Code does not speak precisely upon this point, but expressly makes the insurers liable only where the collision is wholly fortuitous or without any fault. This doubt, or difference of opinion, goes strongly to show that the opinion of the continental writers is based upon, and most closely connected with their own ordinances; and thus it takes greatly, if not entirely, away the force of their authority over contracts made in countries where no such law is known; and it leaves in full power the distinct English authority, which is made under laws and usages, and upon policies that are like our own.

If this case is to be likened to other cases of injury from supposed causes, we should suppose any such analogy favourable to

us. Thus, it is perfectly well known, that at Buénos Ayres, and in the East, at Sumatra, and in a Chinese port, it has actually happened, and more than once, and the newspapers of the land were full of the story, that for a collision or some mischief done or supposed to be done, by officers or crew, the ship has been seized, and only restored on payment of a heavy ransom; but nobody ever heard of a call on an insurance company for any such loss. Can the case be supposed to resemble rather a case of salvage? It is true, that the loss by salvage, or by costs of Court, is always cast upon underwriters; though there the peril of the sea may be thought, in some sense, the remote cause, and the law the proximate cause. But there is a very great difference between these cases, and one that wholly destroys the analogy. The costs of Court, and the payment of salvage, belong to the universal law of insurance. Every man who insures or is insured anywhere, does so under the law of salvage; and his contract, therefore, acknowledges and respects this law. But it is just otherwise in the present case.

There is another material difference. In the present case, the contribution is in the nature of penalty, or at least, a satisfaction and compensation made by this vessel to the other. Not so with salvage. That proceeds wholly upon the theory, that it is for the benefit of the wrecked or endangered vessel, and therefore, for the insurers upon the vessel: and this principle is repeated in almost every case of salvage, as the reason why more is given to the salvors than mere wages, or compensation for time and labour. And these remarks lead us to the more general view of the case, and to what, we cannot but think, ought to be the governing and determining principle of it, namely, that where an accident occurs which is clearly insured against—a collision for instance—then all those consequences thereof are to be taken as parts of the same thing and as belonging to the collision, which flow from it by as natural and obvious, or inevitable consequences, or which are caused by a universal or general law, to which all parties to the insurance are supposed to refer equally in their contract. And all other consequences of the collision, except such as these, are to be considered as not necessary and component parts of the accident, but as connected with it by some local law, or some peculiar circumstance; and are, therefore, not to be considered as insured against by parties, who could not be supposed to have contemplated or anticipated them. This last point seems to us to contain the whole gist of the matter; nor can we perceive how the Court can admit the plaintiff's claim, without distinctly contravening their own uniform and well-established decisions.

It may be proper to advert briefly to one other point. It may be suggested that the defendants are bound by the settlement in Hamburgh, as by a foreign adjustment of general average. But the distinction upon that point is perfectly clear and well settled. It is this: No foreign adjustment can determine for us, what is a general average; but it may settle, definitively as between all the parties, that

general average which is one by our own law, and has certainly happened. In other words, we can always go behind a foreign adjustment of general average, and deny that the facts happened, or that, if they happened, they constituted a general average; but if facts certainly occurred, which by our own law of insurance constitute a general average, then the adjustment in the foreign port is binding upon all the interests. But it is perfectly clear that this is not the present case, and that by our law of insurance, the facts in the present case would not constitute a general average.

Mr. Webster, in reply to the argument for the defendants, submitted to the Court, that it appeared to him that the first positions maintained by the counsel for the insurance company were questionable, to the extent claimed by him. He says, that however it may be in regard to some other contracts, the law of insurance looks only at the proximate cause of loss. That this is generally true, may be admitted; but it is not universally true.

If the proposition were universal, it would certainly exclude salvage. Mr. Parson's answer to this, is, that the payment of salvage is a loss, by the universal law of insurance. This is so: and this proves, not that no case of loss by a remote cause is within the law of insurance, but, on the contrary, that one such case, at least, is within that law by universal consent. The same may be said of costs incurred in the course of judicial proceedings, and of payments on account of general average.

Mr. Parsons admits that collision is insured against, and that all consequences may be regarded as belonging to it which flow naturally from it, or which are caused by a general law, to which all parties may be supposed to have referred. But how can he distinguish, or what reason is given for a distinction, between consequences which immediately arise from natural causes, and those which arise as immediately from the operation of the laws of the place? A ship suffers collision; the immediate natural effect is injury to her frame. The necessity of an expenditure for repairs is immediately inflicted upon her; and for this expenditure, the underwriter is liable. Another ship suffers a collision, and does injury to the vessel in which she has come in contact, without fault. The immediate consequence, by the law of the place, is a charge on the ship, creating a lien, for a contribution to the loss; and this charge causes the necessity of an expenditure. It is not easy to perceive a reason why one of these cases should be within the policy, and the other not within it. The loss, in the latter case, is a consequence of the accident, as necessary, as certain, and as unavoidable as that in the first. The charge becomes attached to the ship; is an encumbrance, hindering her from the prosecution of her voyage; keeping her where she is, and removable only by an expenditure. It is an obvious consequence of the accident; and, in the language of Mr. Parsons, an "inevitable" consequence. The party entitled to the contribution is as sure to claim it, as the carpenter who makes repairs is to

14

demand payment. The expenditure is as inevitable in one case as in the other.

Mr. Parsons supposes that the continental authorities are the less to be regarded, as the policies in those countries are different. Thus, he says, that "accidentally running foul" is one of the specifically enumerated causes of loss in a French policy. Be it so. But that fact does not help to settle the question, what loss is to be regarded as the proper consequence of running foul. "Running foul," or collision, it will not be denied, is as completely within this policy, as within a French policy; and the form or particular words of the policy, in either case, do not affect or touch the question now in controversy. How can it be said that the French policies provide for this very case? Do they expressly provide for the case of contribution for collision? They certainly do not. They only mention collision, leaving the law to settle what losses arise from it, and how these losses are to be settled. "This very case," in the language of my learned brother, is not a case in which any question is made, whether a loss by collision is within a policy, American, English, or French. It is admitted to be within them all. The question, and the only question, in this case, is, whether the loss which has actually happened, is or is not a loss by collision. And how, then, is the force of those continental authorities, which declare that losses like this are losses by collision, annihilated? The slightest reason is not seen to suppose that the decisions of the continental writers have been founded, either on the forms of the policies in use on the continent, or on any ordinances. The law of the place imposes contribution in cases of collision. The continental writers are authorities to show that it follows, not from any ordinance or from any particular words in continental policies, but from the general law of insurance, and the reason of the thing, that the discharge of this contribution is a loss, occasioned by collision.

Many cases might be put to establish the construction for which we contend.

The case of capture is one. If a neutral ship, insured against capture, be actually captured, carried in, and released, on payment of costs and expenses to the captors, (a very common case,) these costs and expenses are always held to be within the policy.

Suppose, again, that perishable articles, like provisions, are slightly injured by a storm, less than to the extent of five per cent., but that, before the vessel reaches her port, the effect of time, acting on the goods thus slightly injured, is such as to destroy all their value. Is there any doubt that, in such a case, the whole loss is to be referred to the storm, and so brought within the policy?

And, in regard to the converse of the case now before the Court, allow the inquiry, what would have been thought of the rights of the parties, if the galliot herself had not been injured, but had injured the Paragon to the extent of a thousand dollars: and suppose the owners of the galliot paid one-half of this sum to the master of the Paragon; could the plaintiffs in this suit have recovered

[Peters *vs.* The Warren Insurance Company.]

more than the balance? Could they pocket what they had received from the galliot, and recover the whole amount of the injury from the defendants?

With a general remark, these observations are closed.

This vessel was insured on time. The commerce of the world was open to her. She was to choose her own track, from nation to nation, or from zone to zone. She was expected, therefore, to fall under the dominion of various codes, and different laws; and to conform, as of necessity she must, to them all, as she should come within the sphere of their respective influences. She must encounter the dangers which belong to the place where she is, or where she goes; and while acting fairly, and in good faith, ought to be protected, as within the policy.

Mr. Justice STORY delivered the opinion of the Court.

This is the case of a division of opinion, certified to this Court by the judges of the Circuit Court for the District of Massachusetts.

The defendant, by a policy of insurance, dated the 1st of April, 1836, insured the plaintiffs, for whom it may concern, payable to them, eight thousand dollars, on the ship Paragon, for the term of one year, commencing the risk on the 13th of March, 1836, at noon, at five per cent. The policy contained the usual risks, and among others, that of perils of the sea. The declaration alleged a loss, by collision with another vessel, without any fault of the master or crew of the Paragon; and also insisted on a general average and contribution. The parties at the trial agreed upon a statement of facts; by which it appeared that the Paragon was owned by the plaintiffs, and was in part insured by the defendants, by the policy above mentioned. On the 10th of November, 1836, the Paragon sailed from Hamburgh, in ballast, for Gottenburgh, to procure a cargo of iron for the United States. While proceeding down the Elbe, with a pilot on board, she came in contact with a galliot, called the Frau Anna, and sunk her. By this accident, the Paragon lost her bowsprit, jib-boom, and anchor, and sustained other damage, which obliged her to put into Cuxhaven, a port at the mouth of the Elbe, and subject to the jurisdiction of Hamburgh, for repairs. Whilst lying there, the captain of the galliot libelled the Paragon in the Marine Court, alleging that the loss of the vessel was caused by the carelessness or fault of those on board of the Paragon. The ship was arrested; but was subsequently released on security being given by the agents of the owners, to respond to such damages as should be awarded by the Court. Upon the hearing of the cause, the Court decided that the collision was not the result of fault or carelessness on either side, and that therefore, according to the marine law of Hamburgh, the loss was a general average loss, and to be borne equally by each party: that is to say, that the Paragon was to bear one-half of the expense of her own repairs, and to pay one-half of the value of the galliot; and that the galliot was to bear the loss of one-half of her own value, and to pay one-half of the repairs of the

Paragon: the result of which was, that the Paragon was to pay the sum of two thousand six hundred dollars, being one-half of the value of the galliot, (three thousand dollars,) after deducting one-half of her own repairs, (four hundred dollars.) The owners of the Paragon having no funds in Hamburgh, the captain was obliged to raise the money on bottomry. There being no cargo on board of the Paragon, and no freight earned, the Paragon was obliged to bear the whole loss.

Upon this state of facts the question arose, whether in this case the contributory amount paid by the Paragon on account of the collision, was a direct, positive, and proximate effect from the accident, in such sense as to render the defendants liable therefor. Upon this question the judges were opposed in opinion; and it has accordingly been certified to this Court for a final decision.

That a loss by collision, without any fault on either side, is a loss by the perils of the sea, within the protection of the policy of insurance, is not doubted. So far as the injury and repairs done to the Paragon itself extend, it is admitted that the underwriters are liable for all the damages. The only point is, whether the underwriters are liable for the contribution actually paid on account of the loss of the galliot.

This point does not appear ever to have been decided in any of the American Courts. It is proper, therefore, to examine it upon principle; and to ascertain what is the true bearing of the foreign authorities upon it.

And first upon principle: That the owners of the Paragon have been compell'd to pay this contribution without any fault on their side, is admitted; that it constituted a proper subject of cognisance by the Marine Court of Hamburgh, the collision having occurred within the territorial jurisdiction of that city, is also admitted; and that the claim constituted a charge or lien upon the Paragon, according to the local law, capable of being enforced by a proceeding in rem, is equally clear. Why, then, should not the loss be borne by the underwriters, since it was an unavoidable incident or consequence resulting from the collision?

The argument is, that in the law of insurance, which governs the present contract, it is a settled rule that underwriters are liable only for losses arising from the proximate cause of the loss, and not for losses arising from a remote cause, not immediately connected with the peril. Causa proxima non remota spectatur. The rule is correct, when it is understood and applied in its true sense; and, as such, it has been repeatedly recognised in this Court. But the question, in all cases of this sort, is, what, in a just sense, is the proximate cause of the loss?

The argument in the present case, on the part of the defendants, is, that the law of Hamburgh is the immediate or proximate cause of the loss now claimed, and the collision is but the remote cause. But surely this is an over-refinement, and savours more of metaphysical than of legal reasoning. If the argument were to be followed

out, it might be said, with more exactness, that the decree of the Court was the proximate cause, and the law of Hamburgh the remote cause of this loss. But law, as a practical science, does not indulge in such niceties. It seeks to administer justice according to the fair interpretation of the intention of the parties; and deems that to be a loss within the policy, which is a natural or necessary consequence of the peril insured against. In a just view of the matter, the collision was the sole proximate cause of the loss; and the decree of the Court did but ascertain and fix the amount, chargeable upon the Paragon, and attached thereto at the very moment of the collision. The contribution was a consequence of the collision, and not a cause. It was an incident inseparably connected, in contemplation of law, with the sinking of the galliot; and a damage immediate direct, and positive, from the collision. In the common case of an action for damages for a tort done by the defendant, no one is accustomed to call the verdict of the jury, and the judgment of the Court thereon, the cause of the loss to the defendant. It is properly attributed to the original tort, which gave the right to damages consequent thereon; which damages the verdict and judgment ascertained; but did not cause.

But let us see how the doctrine is applied in other analogous cases of insurance, to which, as much as to the present case, the same maxim ought to apply, if there is any just foundation for it here. If there be any commercial contract which, more than any other, requires the application of sound common sense and practical reasoning in the exposition of it, and in the uniformity of the application of rules to it, it is certainly a policy of insurance; for it deals with the business and interests of common men, who are unused to deal with abstractions and refined distinctions. Take the case of a jettison at sea, to avoid a peril insured against. It is a voluntary sacrifice, and may be caused by the perils of the sea; but it is ascertained long afterwards, and that ascertainment, whether made by a Court of justice, or by an agreement of the parties, would, in the sense of the maxim contended for in the argument, be the immediate cause of the contribution, and the jettison but a remote cause; and the violence of the winds and waves a still more remote cause of the jettison. Yet all such niceties are disregarded, and the underwriters are held liable for the loss thus sustained by the jettison, as a general average. It is no answer to say, that this is now the admitted doctrine of the law; and therefore it is treated as a loss within the policy. The true question to be asked is, why is it so treated? General average, as such, is not, eo nomine, insured against in our policies. It is only payable when it is a consequence, or result, or incident (call it which we may) of some peril positively insured against; as, for example, of the perils of the sea. The case of a ransom after capture stands upon similar grounds. The ransom is, in a strict metaphysical sense, no natural consequence of the capture. It may be agreed upon long afterwards: and if we were to look to the immediate cause, it might be said that the voluntary act of the party

in the payment was the cause of the loss. But the law treats it as far otherwise; and deems the ransom a necessary means of deliverance from a peril insured against, and acting directly upon the property. The expenses consequent upon a capture, where restitution is decreed by a Court of Admiralty upon the payment of all the costs and expenses of the captors, fall under a similar consideration. In such cases, the decree of the Court allowing the costs and expenses may be truly said to be the immediate cause of the loss; but Courts of justice treat it also as the natural consequence of the capture.

A still more striking illustration will be found in the case of salvage decreed by a Court of Admiralty for services rendered to a vessel in distress. The vessel may have been long before dismasted or otherwise injured, or abandoned by her crew in consequence of the perils of the winds and waves; and the salvage decreed in such a case, would seem, at the first view, far removed from the original peril, and disconnected from it: and yet, in the law of insurance, it is constantly attributed to the original peril, as the direct and proximate cause; and the underwriters are held responsible therefor, although salvage is not specifically, and in terms, insured against.

These are by no means the only illustrations of the danger of introducing such an application of the maxim into the law of insurance, as is now contended for. Suppose a perishable cargo is greatly damaged by the perils of the sea, and it should, in consequence thereof, long afterwards, and before arrival at the port of destination, become gradually so putrescent as to be required to be thrown overboard for the safety of the crew: the immediate cause of the loss would be the act of the master and crew; but there is no doubt that the underwriters would be liable for a total loss, upon the ground that the operative cause was the perils of the sea. Suppose a vessel which is insured against fire only, is struck by lightning, and takes fire; and in order to save her from utter destruction, she is scuttled and sunk in shoal water, and she cannot afterwards be raised; it might be said that the immediate cause of the loss was the scuttling: but in a juridical sense, it would be attributed to the fire; and the underwriters would be held liable therefor. Suppose another case, that of a vessel insured against all perils but fire; and she is shipwrecked by a storm on a barbarous coast, and is there burnt by the natives: it might be said that the proximate cause of the loss was the fire; and yet there is no doubt that the underwriters would be held liable on the policy, upon the ground that the vessel had never been delivered from the original peril of shipwreck.

Illustrations of this sort might be pursued much farther, but it seems unnecessary. Those which have been already suggested sufficiently establish, that the maxim, causa proxima non remota spectatur, is not without limitations; and has never been applied in matters of insurance to the extent contended for: but that it has been constantly qualified, and constantly applied only in a modified practical sense, to the perils insured against. In truth, in the present

case, the loss occasioned by the contribution is (as has been already suggested) properly a consequence of the collision; and in no just sense a substantive independent loss.

In the next plea, how stand the authorities on this subject? The only authority which has been cited by the counsel for the defendants, to sustain their argument, is the case of De Vaux *vs.* Salvador, 4 Adolphus and Ellis' Rep. 420. That case is certainly direct to the very point now in judgment. It was a case of collision, where the assured had been compelled to pay for an injury done to another vessel by the mutual fault of both vessels, according to the rule of the English Court of Admiralty; which, in a case of mutual fault, apportions the loss between them. Lord Denman, in delivering the opinion of the Court, admitted that the point was entirely new; and after referring to the above maxim, said, " It turns out that the ship (insured) has done more damage than she has received, and is obliged to pay the owners of the other ship to some amount, under the rule of the Court of Admiralty. But this is neither a necessary nor a proximate effect of the perils of the sea. It grows out of an arbitrary provision in the law of nations; from views of general expediency, not as dictated by natural justice, nor (possibly) quite consistent with it: and can no more be charged on the underwriters than a penalty incurred by contravention of the revenue laws of any particular state, which was rendered inevitable by perils insured against." This is the whole reasoning of the learned judge upon the point; and with great respect, if the views already suggested are well founded, it is not supported by the analogies of the law, or by the principles generally applied to policies of insurance. The case of a penalty, put by the learned judge, does not strike us with the same force as it does his lordship. If any nation should be so regardless of the principles of natural justice, as to declare that a vessel driven on shore by a storm should be forfeited because its revenue laws were thereby violated; it would then deserve consideration whether the underwriters would not be liable for the loss, as an inevitable incident to the shipwreck. At all events, the point is too doubtful in itself to justify us in adopting it as the basis of any reasoning in the present case.

The case before the King's Bench was confessedly new, and does not appear upon this point to have been much argued at the bar. It seems to have been decided, principally, upon the ground of the absence of any authority in favour of the assured; and as it appears to us, in opposition to the analogies furnished by other acknowledged doctrines in the law of insurance.

The same question, however, has undergone the deliberate consideration of some of the greatest maritime jurists of continental Europe; and the result at which they have arrived is directly opposite to that of the King's Bench. Pothier lays it down as, in his opinion, the clear result of the contract of insurance, that the underwriters are bound to pay not only the direct loss occasioned by any peril insured against, but all the expenses which follow as a conse-

quence therefrom. Pothier, Traité d'Assurance, n. 49. Estrangin, a very excellent modern commentator upon Pothier, (Estrangin's note,) asserts that there is not the slightest doubt on the subject. Emerigon, whose reputation as a writer on the law of insurance is second to no one, unequivocally adopts the same opinion. Emerig. Assur. ch. 12, s. 14, p. 414—417. In short, all those learned foreigners hold the doctrine that whenever the thing insured becomes by law directly chargeable with any expense, contribution, or loss, in consequence of a particular peril, the law treats that peril, for all practical purposes, as the proximate cause of such expense, contribution, or loss. And this they hold, not upon any peculiar provisions of the French ordinance, but upon the general principles of law applicable to the contract of insurance. In our opinion this is the just sense and true interpretation of the contract.

It has been suggested that there is a difference between our policies and the French policies; the latter containing an express enumeration of fortuitous collision, or running foul, (abordage fortuit,) as a peril insured against; while in our policies it falls only under the more general head of "perils of the sea." But this furnishes no just ground for any distinction in principle. The reasoning, if any, to be derived from this circumstance, would seem rather to apply with more force in favour of the plaintiff, since, even when the risk of collision is specifically enumerated, the expenses and contribution attendant upon it are treated as inseparable from the direct damage to the vessel itself, as a part of the loss. In short, whether a particular risk is specified in terms, or is comprehended in the general words of the policy, the same result must arise, viz. that the underwriters are to bear all losses properly attributable to that peril; and no other losses.

It may be proper to remark, that the rule which we here adopt, is just as likely, in actual practice, to operate favourably as unfavourably to the underwriters. If by the collision the Paragon had been sunk, and the galliot saved, the underwriters would have had the entire benefit of the reciprocity of the rule. It would sound odd that in such a case the underwriters should be entitled to receive the full benefit of the Hamburgh law for their own indemnity; and yet in the opposite case, that they should escape from the burden imposed by that law.

In all foreign voyages, the underwriters necessarily have it in contemplation that the vessel insured must, or at least may be, subjected to the operation of the laws of the foreign ports which are visited. Those very laws may in some cases impose burdens, and in some cases give benefits, different from our laws; and yet there are cases under policies of insurance, where it is admitted that the foreign law will govern the rights of the parties, and not the domestic law. Such is the known case of a general average, settled in a foreign port according to the local law; although it may differ from our own. Simonds vs. White, 2 Barn. and Cresw. 805. In the present case, the policy was on time, and the vessel had, as it were,

[Peters *vs.* The Warren Insurance Company.]

a roving commission to visit any foreign port; and of course might well be presumed at different periods to come under the dominion of various codes of laws, which might subject her to various expenditures and burdens. The underwriters have no right to complain, that when those expenditures and burdens arise from a peril insured against, they are compelled to pay them; for they were bound to have foreseen the ordinary incidents of the voyage. Suppose a vessel injured by the perils of the sea puts into a foreign port to repair, and the license to repair, or the repairs themselves, are burdened with a heavy revenue duty; no one will doubt that the charge must be borne by the underwriters, as an expense incident to the repair: and yet it might truly be said not to be the natural result of the peril, but only a charge imposed by law, consequent thereon.

Upon the whole, we are of opinion that it be certified to the Circuit Court, that in this case the contributory amount paid by the Paragon, on account of the collision, was a direct, positive, and proximate effect from the accident, in such sense as to render the defendants liable therefor upon this policy.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Massachusetts, and on the point and question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this Court for its opinion, agreeably to the act of Congress in such cases made and provided; and was argued by counsel. On consideration whereof, it is the opinion of this Court that, "in this case, the contributory amount paid by the Paragon, on account of the collision, was a direct, positive, and proximate effect from the accident, in such sense as to render the defendants liable therefor upon this policy." Whereupon it is ordered and adjudged by this Court, that it be so certified to the said Circuit Court.