## BOARD OF COM'RS OF PORT OF NEW ORLEANS v. NORWICH UNION FIRE INS. SOC., Limited.

### Civil Action No. 69.

District Court, E. D. Louisiana,
New Orleans Division.

Aug. 14, 1943.

246

Lewis L. Morgan and Eldon S. Lazarus, both of New Orleans, La., for plaintiff.

St. Clair Adams & Son, of New Orleans, La., for defendant.

CAILLOUET, District Judge.

This suit of the plaintiff to recover judgment against the defendant in the principal sum of $20,547.60, "with 12% additional thereon as damages and with interest and attorney's fees", was first filed in the prop-

er State court, from which defendant thereupon effected removal.

On July 1, 1937, said defendant, Norwich Union Fire Insurance Society, Ltd., a foreign corporation, issued under the counter-signature of its duly authorized New Orleans agents to the plaintiff Board of Commissioners of the Port of New Orleans, an agency of the State of Louisiana, two certain one-year policies of insurance (expiring July 1, 1938), carrying stated limits of liability, respectively far in excess of the amount herein sued for; which original amount, in each policy, was greatly increased by four consecutively-added policy riders, while all other policy terms and conditions were specifically confirmed, upon the making of each one of the said four amendments.

One of the said two policies insured the plaintiff against "all direct loss or damage by explosion" and the other, against "all direct loss or damage by fire"; there were listed, in each, special exceptions and exclusions, of no moment here, except as may be hereinafter specially noted.

The insured property, in each policy, was referred to, in typewritten inserted matter, as being: "On grain and seeds of all kinds, their own, or held by them in trust or on storage, or on commission or consignment, or for which they may be legally liable, or sold but not delivered, including all earned and unpaid freight, storage and elevator charges, while contained in any of the buildings and conveyors thereto, known as the PUBLIC GRAIN ELEVATOR, and in cars on tracks within THREE HUNDRED (300) FEET of any of the buildings or structures comprising the GRAIN ELEVATOR PLANT, situated on East Bank of the Mississippi River between Soniat and Leontine Streets, in New Orleans, La."

In the "explosion policy" it was expressly provided that the insurer, however, should not be liable for loss or damage covered under "any fire or other kind of insurance contract" nor "for loss by interruption of business, manufacturing processes, or otherwise.", and that the policy should "in no event be construed to cover loss or damage by fire whether resultant from explosion or not".

By still another amending rider the words "storage and elevator charges" which appeared, as aforesaid, in the description of the insured property, were de-

leted for the specific purpose of excluding coverage of such storage and elevator charges; but, again, express declaration was made that all other policy terms and conditions remained unchanged.

In the "fire policy" it was expressly provided that the insurer would not be liable for loss caused directly or indirectly by explosion of any kind unless fire ensued and, in that event, for the damage by fire only; but it was also provided therein that, "in the interest of the insured", the policy condition excluding loss or damage from explosion was modified so that, in consideration of the rate at which the policy was written, the company would be liable for "any direct loss or damage" to all of the property insured, (but only while said property was covered by the policy) caused by an explosion resulting from "the hazards inherent in the business as conducted", *except* that said insurer would not be liable for "loss or damage occasioned by or incident to the explosion, collapse or rupture of steam or hot water boilers," etc., "unless fire ensued and then, for loss or damage by fire only."

As was the case with reference to the "explosion policy", the insurer under the terms of the "fire policy" was not to be held liable for any loss occasioned "by interruption of business, manufacturing process, or otherwise", and the words "storage and elevator charges" were deleted by rider from the insured property description but all other policy terms were, at the same time, expressly confirmed.

Plaintiff's petition or complaint alleged that while both of said mentioned policies were in full force and effect, i. e., on April 4, 1938, an explosion with ensuing fire took place in plaintiff's public grain elevator, resulting from the hazards inherent in its business as the same was by it conducted therein; that besides the death of six and the injury of sixteen persons on the premises as the explosion's unfortunate toll, the grain elevator was damaged "and the machinery that performed the work of turning and drying the undried corn stored therein was totally ruptured"; that there was then stored in said public grain elevator for various owners, preparatory to shipment, a particular lot of 684,920 bushels of undried corn which, when said machinery for the proper handling and drying of said corn was so wrecked and disabled, rapidly deteriorated during the resultant interruption, which plaintiff diligently sought to

terminate as soon as physically possible; that the damages suffered by such owners, by reason of such unavoidable deterioration, aggregated $20,547.60, which plaintiff was obliged to pay, and did pay, unto them; that the aforementioned insurance policies having been taken out and issued for the purpose of insuring plaintiff against any loss or damage whatever to grain held on storage, such as said lot of corn in question, plaintiff made demand upon the insurer to be paid said outlay, but without avail; and, finally, that the insurer having failed to settle the claimed loss suffered within the time prescribed by law, plaintiff should be adjudged entitled to recover from defendant not only said $20,547.60, but 12% damages on the total amount of loss as may be determined by the Court, with reasonable attorneys' fees for the prosecution and collection of such loss.

There was first filed, and denied in due course, defendant's motion to dismiss the plaintiff's action because, so movant asserted, the complaint fails to state a claim against defendant upon which relief can be granted; and defendant then answered substantially alleging that it was under no obligation to the assured, because—

1. The claimed loss was not one that "was caused proximately or directly by fire",—was not "a direct loss or damage by fire, within the intendment of the policy contracts";

2. Plaintiff's alleged loss or damage "did not occur at the time of said fire, but resulted from causes other than the fire after the fire had been extinguished and after the passing of many days and consequently said alleged loss and damage is not a proximate or direct loss or damage by fire"; and

3. The policy contracts "expressly except from liability for loss and damage by fire, all loss and damage that was occasioned by 'interruption of business, manufacturing processes, or otherwise'" and the alleged loss and damage, if it did occur, resulted from the "interruption of business or manufacturing process or otherwise" and *not* "proximately or directly from the fire".

By reason of a pre-trial conference stipulation and admissions made at the trial, it was established that plaintiff did have in custody, on April 4, 1938, 684,820 bushels of corn; that an explosion and fire occurred in plaintiff's grain elevator on that

day; that, as a result thereof, "the building was damaged and the machinery that performed the work of turning and drying the undried corn was injured and made inoperative for six days * * * and possibly partially inoperative for a further twenty-four hour period"; that the plaintiff "did everything it possibly could in order to bring about a complete repair and restoration of that equipment" so that operations might be resumed, as they were, without more delay than necessary; that plaintiff did pay to owners of damaged corn, with respect to said explosion and fire, the aggregate amount of $20,547.60; that, if it be found that liability rests upon defendant for the damages sued for, then the insurer admits the claimed sum of $20,547.60, alleged to represent the damages done to the corn during six days total and twenty-four hours partial non-operation of the grain elevator's machinery, to be reasonable; and that, if plaintiff be entitled to recover the claimed attorney's fees, then the rate for calculating the same upon the aggregate recovery shall be 15%, which defendant also admits to be reasonable.

The proof was that none of the corn for which the $20,547.60 was paid as damages, was actually burned, or affected by something from the fire, or by water used in fighting said fire, and that the damage done to the corn resulted from enforced cessation of the drying process, while the elevator's machinery for that purpose, which the explosion and ensuing fire threw out of commission, could not be used.

On the day following the explosion and fire of April 4, 1938, John W. Whitty, member of the firm who served as defendant's general agents in the issuing of the two policies of insurance to plaintiff, wrote to it saying that it was by way of confirmation of his firm's prior advices to plaintiff to the effect that the insurance companies in interest authorized the insured to proceed with the repairing of the damage done by such fire and explosion so that the grain elevator might be restored to operative status as soon as possible; and said letter contained the following two paragraphs towards the close thereof, viz:

"With reference to the grain, it will be in order for you to handle this with whatever grain dealer here with whom you can make the best arrangements, submitting to the insurance company the actual amount of loss, and payment will be made accordingly.

That is, you are to handle the entire matter the same as if you had no insurance, in the most economical way possible under the circumstances and to submit to the insurance companies through the Fire Companies' Adjustment Bureau the amount of loss as soon as possible."

It was on the faith of what, plaintiff claims, it was thus led to believe was defendant's authorization to effect settlement of losses, that it did, in due time, dispose of the several claims for damaged corn, aggregating the $20,547.60 for which plaintiff now seeks recovery, and which defendant admits to have been a reasonable amount to pay, under the circumstances, although it does deny its claimed liability therefor.

The present state of the record renders it unnecessary to enter into an extended discussion of just what legal effect and binding authority upon the insurer resulted from the acts of its general agents in so dealing with the insured, after there had occurred the claimed loss or damage to the corn of the sundry owners, which they had on storage in plaintiff's public grain elevator, and with reference to which corn the Board of Commissioners of the Port of New Orleans was admittedly, insured against "all direct loss or damage by fire", or as to whether, conceding said general agents' full authority to bind their principal, the Board of Commissioners of the Port of New Orleans would thereby have been warranted in so disposing of the corn owners' loss or damage claims to the aggregate amount of $20,547.60, if such losses had not been caused "proximately or directly by fire" and had not been actually insured against, and if the insured's claimed loss or damage in said amount had been occasioned by "interruption of business, manufacturing process, or otherwise," liability of the insurer for which (so defendant urges) was specifically excepted by the policy terms.

■ The burden always rests upon the insurer, of course, to establish by the preponderance of evidence all such facts as are necessary to substantiate any claim made that, under the policy terms, the insured may not recover because of specific exemption or limitation of liability. 29 Am.Jur. § 1444, pp. 1083–1084 (1940); Massachusetts Protective Association, Inc. v. Ferguson et ux., 1929, 168 La. 271, 121 So. 863; The Home Benefit Ass'n v.

Sargent, 1892, 142 U.S. 691, 12 S.Ct. 332, 35 L.Ed. 1160.

It appears needless to observe that the record does not establish, in remotest degree, that the Board of Commissioners of the Port of New Orleans is seeking to recover for loss or damage sustained by the total or partial falling off of the public grain elevator's operating returns, such as storage charges and the like, during the enforced cessation of business immediately resulting from the explosion and ensuing fire; any contention, therefore, that the policy terms here in issue specifically except from liability (for direct loss or damage by fire) all loss or damage occasioned by interruption of business or manufacturing processes, or "otherwise", serves no good purpose.

Quoting the following excerpt from "The Fire Insurance Contract, Its History and Interpretation", compiled, edited and published under the auspices of The Insurance Society of New York, viz.:

"Except where it is otherwise specifically provided, the insurer will not be liable for consequential damages, such as loss of the use of a store or factory, loss of rents, the incidental loss of trade and consequent loss of prospective profit, these being regarded as too remote and not supposed to enter into the calculation of the contracting parties. Thus a policy on a bridge does not cover incidental loss of tolls from the adjacent turnpike belonging to plaintiffs". (Citing four State cases—from New York, Massachusetts, Pennsylvania and Kentucky, respectively.)

"The standard policy contains a condition expressly disclaiming liability, unless specifically assumed, for loss occasioned 'by interruption of business, manufacturing process or otherwise'. Losses of this nature, however, are taken care of by special contracts in the shape of rent, profit and use and occupancy insurance, which classes in recent years have assumed quite large proportions.",

it is submitted that defendant's position in the defense of this action "is succinctly and accurately stated in the above quotation" which also represents (so runs the argument) the "settled jurisprudence of the Supreme Court of the State of Louisiana upon the subject, as that jurisprudence is clearly and carefully set forth" in the following three cases, which "have never been distinguished, modified or reversed" and "represent the current opinion" of said Supreme Court, viz.: Caballero & Basualdo v. Home Mutual Ins. Co., 1860, 15 La.Ann. 217; McCargo v. New Orleans Ins. Co., 1845, 10 Rob., La., 202, 43 Am.Dec. 180; Leonarda v. Phœnix Assurance Co., 1842, 2 Rob., La., 131, 38 Am.Dec. 205.

It may be observed, in passing, that the fire policy at issue in this present case is the Louisiana standard fire insurance policy; that the aforementioned trade publication is assumed to be regarded, within its normal sphere of influence, as dependable interpreter of standard policy provisions relating to "consequential damages"; and that, apparently, its understanding of just what is meant by consequential damages does not in any manner envisage a state of facts such as is reflected by this present action.

Returning to a consideration of the three abovementioned Louisiana cases upon which defendant so places reliance, it is found that in the Leonarda Case the fire insurance policy there at issue provided that upon loss or damage by fire the insured property was to be restored to its former state by the insurer, or, upon proof of the amount of loss or damage sustained, the insurer might pay the claim instead.

Fire-damaged insured premises in New Orleans having been restored to their former state by the insurer, after repair operations lasting three months, suit was then brought by the insured to recover $1,200 as rent of the premises, which had been necessarily occupied by the insurer's employees while the repair work was being done; there was no dispute as to the value of the claimed rent nor as to the duration of the repair period; the sole question being whether rent was properly chargeable.

The insurer's alternative of restoring to former state necessarily implied the allowance of a reasonable time for its execution and the insured was fully aware of this; inasmuch as the policy contained no stipulation for the payment of rent during the repair period, as was actually the custom of inserting at that time in the policies of several insurance companies in New Orleans (said the Court), it was held that the insured's rent claim could not be exacted from the insurer.

It is interesting to note the Court's rejoinder to the insured's contention that since the policy of insurance is "a contract of indemnity, the underwriters are bound

to adjust the loss upon the principle of replacing the party assured, as nearly as may be, in the situation he was in before the fire." Said the Court: "This is unquestionably true as a general principle, and in relation to the subject-matter insured, but it has never been understood to extend to the profits or fruits the assured was drawing, or might have drawn, from the thing insured. These are consequential losses, for which he can not be indemnified, especially when such losses fall on things susceptible of being insured separately."

In the McCargo case, the Court announced itself to be concerned solely with the inquiry as to what was the proximate, efficient cause of the loss which gave rise to the suit, and in discussing that problem cited several cases, each one of which is in agreement with the following pronouncement in 1 Story, 164, viz: "All the consequences *naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself.* If there be a capture and before the vessel is delivered from that peril, she is afterwards lost by fire or accident, or negligence of the captors, I take it to be clear that the whole loss is properly attributable to the capture." (Emphasis supplied).

In the Caballero case, the insurer was obligated, under the terms of the insurance policy in question, "to make good" to the insured "all such loss or damage as should happen by fire" to his store.

A fire broke out in a building located approximately two hundred feet distant from the insured's store. Gunpowder stored in the burning building exploded with such resultant concussion of air and earth that the insured's store was thereby damaged to the extent of $950.00; fire at no time reached the insured's premises nor was the store ever in danger therefrom, said the Court, which, after a rather full discussion of the subject of "proximate cause", concluded as follows:

"Perhaps, after all, it might be safe here, as in other contracts, to inquire whether the loss was within the reasonable intendment of the parties when they made the contract. Did they intend, by an insurance against fire, to cover losses arising from the concussion of the air produced by the explosion of gun-powder on the premises of other persons than the insured?

"We think such an extraordinary result could not have been contemplated by the parties. We do not think insurance companies can be considered responsible for the consequences of the combustion of gunpowder, unless that combustion has happened in the premises insured, or the gunpowder is itself, with other merchandise, covered by the policy".

The Board of Commissioners of the Port of New Orleans was insured, as aforesaid, "against all direct loss or damage" with reference to the corn of others stored in its public grain elevator.

It is unquestioned that while its two policies of insurance were in full force and effect an explosion and ensuing fire did take place in said grain elevator, with the result that said stored corn was injured and that the insured did suffer loss or damage, with respect thereto, in the aggregate amount of $20,547.60; if such loss or damage may be legally characterized as "direct", within the intendment of the policy terms, then plaintiff should recover said sum from the insurer.

The word "direct", as so used in an insurance policy, means "immediate" or "proximate", as distinguished from "remote". 12 Words and Phrases, Perm.Ed., p. 443.

For the fire in the present case to be held the direct and proximate cause of the loss or damage for which plaintiff seeks indemnification, it is only necessary to find that such loss or damage followed reasonably from its occurrence, without intervention, between fire and final result, of an intermediate *controlling* and *efficient* cause; that the fire was the "procuring, efficient and predominant cause" of the result complained of, which set in motion the train of events that brought such result into being without intervention of "any force operating or working actively from a new and independent source"—without intervention of a disconnected *self-operating* cause; that such fire even though *not* the last link in a chain of events—*not* nearest in point of time or place to the result—was nevertheless the *dominant* (as distinguished from *incidental*) cause that produced the loss or damage sustained; that without such fire, under the proved facts, *the result would not have occurred.* 38 Am.Jur. § 49, § 50, pp. 649-695 (1941); 12 Words and Phrases, Perm.Ed.,1940, p. 56; Dixie Pine Products Co. v. Maryland Casualty Co., 5 Cir., 133 F.2d 583, rehearing denied March 12, 1943, certiorari denied May 3, 1943,

63 S.Ct. 1033, 87 L.Ed. ——; Milwaukee & St. Paul Railway Co. v. Kellogg, 1877, 94 U.S. 469, 24 L.Ed. 256; Ætna Ins. Co. v. Boon, 1877, 95 U.S. 117, 143, 24 L.Ed. 395. 6 Couch on Insurance (1930), § 1463, at page 5295. 6 Cooley's "Briefs on Insurance" (2d Ed.1928), p. 4942 (e).

In 1938, the case of Lanasa Fruit Steamship & Importing Co. Inc. v. Universal Insurance Company, 302 U.S. 556, 58 S.Ct. 371, 374, 82 L.Ed. 422, was before the Supreme Court of the United States on certiorari to the Circuit Court of Appeals for the Fourth Circuit, where judgment for the defendant had been affirmed, 89 F.2d 545; it involved the one question, viz., whether under the terms of a marine policy insuring against perils of the sea, recovery could be had for the loss of an entire cargo of bananas that became overripe and rotted, within the delay intervening between the time that the carrying vessel stranded and its re-floating; the defendant insurance company having successfully contended before both lower courts that the cargo being of a perishable nature, it was its inherent vice of decay rather than the stranding of the vessel (a peril of the sea insured against) that was the proximate cause of the loss sustained by the insured and that, therefore, no liability rested on the insurer.

The Supreme Court, in an exhaustive and well-considered decision on the subject of "proximate cause", said in part, viz.:

"It is true that the doctrine of proximate cause is applied strictly in cases of marine insurance. But in that class of cases, as well as in others, the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result. Ætna Insurance Company v. Boon, 95 U.S. 117, 130, 24 L.Ed. 395; Arnould on Insurance, 11th ed., § 783.

"The subject was discussed in an illuminating way by Lord Shaw in his judgment in Leyland Shipping Company v. Norwich Union Fire Insurance Society, (1918) A.C. 350, 368–371. He said:

"'To treat proxima causa as the cause which is nearest in time is out of the question. Causes are spoken of as if they were as distinct from one another as beads in a row or links in a chain, but—if this metaphysical topic has to be referred to—it is not wholly so. The chain of causation is a handy expression, but the figure is inadequate. Causation is not a chain, but a net. At each point influences, forces, events, precedent and simultaneous, meet; and the radiation from each point extends infinitely. At the point where these various influences meet it is for the judgment as upon a matter of fact to declare which of the causes thus joined at the point of effect was the proximate and which was the remote cause.

"'What does "proximate" here mean? To treat proximate cause as if it was the cause which is proximate in time is, as I have said, out of the question. The cause which is truly proximate is that which is proximate in efficiency. That efficiency may have been preserved although other causes may meantime have sprung up which have yet not destroyed it, or truly impaired it, and it may culminate in a result of which it still remains the real efficient cause to which the event can be ascribed.'

\*     \*     \*     \*     \*

"In the Leyland Case the House of Lords approved the decision of the Court of Appeal in Reischer v. Borwick, (1894) 2 Q.B. 548, where the policy covered collision with any object but excluded perils of the sea. The ship struck a snag which made a hole in her. She was anchored and the leak was temporarily plugged. Then, while she was being towed towards the nearest dock for repair, the water burst through the hole and she had to be run aground and abandoned. The contention was that the proximate cause of the damage was the excepted marine peril of the inrush of the sea water. But the Court of Appeal held that the proximate cause was the collision with the snag.

\*     \*     \*     \*     \*

"If we apply this principle of the 'real efficient cause' to the instant case, it can hardly be doubted that upon the facts assumed the loss would be within the coverage of the policy. Indeed this is not strongly contested, but it is insisted that the case is controlled by certain precedents to which we should give heed in dealing with an ancient form of words. These precedents are found in certain English cases to which the Circuit Court of Appeals referred. The court recognized that a number of American cases had taken a different view, but thought that, in the absence of a contrary decision by this Court or any federal court, the cited English cases should be followed in the view that in the field of marine insurance 'it is highly desirable that

252

our decisions be kept in harmony with those of England.' 89 F.2d 545, at page 549.

\* \* \* \* \*

"It seems that neither of these cases went to the House of Lords, and we find it impossible to reconcile Lord Esher's ruling, 'that according to the English law of marine insurance only the last cause can be regarded,' with the elaborate exposition of the doctrine of proximate cause which has been given by the House of Lords in Leyland Shipping Company v. Norwich Union Fire Insurance Society, supra, from which we have quoted. \* \* \*"

In passing, it may be said that the Norwich Union Fire Insurance Society, which was defendant in the Leyland Shipping Company case, thus discussed by the Supreme Court, is assumed to be the same Norwich Union Fire Insurance Society, Ltd., of Norwich, England, which issued the two insurance policies to the Board of Commissioners of the Port of New Orleans, as aforesaid.

■ Said policies are contracts with said Board of Commissioners of the Port of New Orleans; they are the law between the parties. The one insures the Board "against all direct loss or damage" by fire, and the other, by explosion, with reference to "grain and seeds of all kinds, their own, or held by them in trust or on storage, etc.", and each, like any other contract, is to be construed according to the sense and meaning of the terms used to express the agreement between the parties; if such terms are clear and unambiguous, they are to be taken and understood in their plain, ordinary and popular sense. Muse v. Metropolitan Life Insurance Co., 1939, 193 La. 605, 192 So. 72, 125 A.L.R. 1075.

And, as said the Supreme Court of the United States, in Peters v. The Warren Insurance Company, 1840, 14 Pet. 99, 39 U.S. 99, 109, 10 L.Ed. 371, 376: "If there be any commercial contract which, more than any other, requires the application of sound common sense and practical reasoning in the exposition of it, and in the uniformity of the application of rules to it, it is certainly a policy of insurance; for it deals with the business and interests of common men, who are unused to deal with abstractions and refined distinctions."

■ The practical, reasonable and fair interpretation of the two contracts, in consonance with the apparent object and intent of the parties thereto, was that the insured operator of the public grain elevator was to be indemnified for any loss or damage which might be sustained by said operator (as the proximate result of fire or explosion, dependent upon the attendant circumstances) with reference to any grain, such as the corn here involved, of other persons which might find its way into said grain elevator in the movement of commerce. It is entirely reasonable to conclude that the parties could have foreseen the possibility of what occurred in the insured's public grain elevator on the fourth day of April 1938, with its continuing uninterrupted succession of events during approximately seven days, so linked together as to make a natural whole; and such possibility must be held to have been envisaged by them as being within the realm of the contingencies insured against, at the very moment of contracting for the indemnification of the insured "against all direct loss or damage, etc.", as might be suffered by it, in the operation of its public grain elevator, with reference to any grain stored therein.

If it can reasonably be contended that, in law, there is still left room for construing what the parties contractant meant by the words just quoted, then their intention must be gathered not only from said words but from the whole body of the language used in the respective contracts, and since the agreements were made and entered into at the same time and are interrelated, the one contract must be read against the other, and consideration of the whole subject-matter must be effected in the light of all attendant circumstances. For instance, the defendant insurance corporation, particularly, certainly did have in mind the possibility that the Board of Commissioners of the Port of New Orleans might sustain direct "explosion" loss or damage with respect to such grain of others as might be stored in the Board's public grain elevator, and did seek to limit its liability as insurer thereagainst, not only by means of the ordinary liability exclusion provision appearing in its own printed form of explosion policy which it made use of, but by preparing and inserting, as added part of said policy, its own special typewritten stipulation to the effect that it would not be liable for any direct "explosion" loss or damage sustained, which was "caused by explosion originating from any materials or processes incident to the business" of the insured. At the same time, said Norwich Union Fire Insurance Society, Ltd. contracted (as

heretofore indicated) with the said Board that, *in the Board's interest* and in consideration of the rate at which the Louisiana standard fire insurance policy was issued, said instrument's printed general provisions to the effect that the insurer would not be liable under the policy terms for loss caused by explosion, unless fire ensued and then only for the damage by fire, was specially modified by the printed "Inherent Explosion Clause", so that said insurance company would actually be liable for any direct loss or damage to all stored grain "caused by explosion * * * occurring in any structure containing property insured hereunder" which resulted "from the hazards inherent in the business as conducted therein".

The contracting parties must be held to have both anticipated the possibility, if not the probability, of just such an explosion originating "from materials or processes incident to" the carrying on of the grain elevator business of the insured, to avert which, as much as possible, mechanical equipment for the turning-over and the drying-out of the moisture content in grain was provided as necessary constituent part of said grain elevator; and that, if such an explosion, with ensuing fire, did take place *then,* as direct, connected, consecutive results necessarily flowing from such accident, would be the disturbance of the mechanical equipment, the cessation of the turning-over and drying-out of the stored grain, injury to said grain resulting proximately and exclusively from such forced interruption of the known usual and necessary operations (without which the risk insured against could not be prevented from coming into being) and, finally, the immediate and direct loss or damage to the insured by reason of such so-sustained injury.

The Court's formal findings of fact and conclusions of law are as follows, to-wit:

### Findings of Fact.

1. On April 4, 1938, and for no less than the next seven days thereafter, the Board of Commissioners of the Port of New Orleans was insured by the Norwich Union Fire Insurance Society, Ltd., against all direct loss or damage sustained by the insured as the result of the explosion and ensuing fire which took place on said April 4, 1938, within said Board's public grain elevator.

2. As immediate result of such explosion and ensuing fire, the grain elevator's component mechanical equipment for the turning-over and drying-out of stored grain was so damaged as to be put *wholly* out of commission for the next succeeding six days, and *partially* so, during the following twenty-four hours, despite the Board's immediate, persistent and altogether appropriate efforts to restore such equipment to full functioning efficiency.

3. The consistent turning-over of grain to prevent exessive heating, and the drying-out of excess moisture in grain, are absolutely necessary operations in the proper conduct of such a grain elevator business as that of the said Board of Commissioners of the Port of New Orleans.

4. Such necessary operations can not be carried on when there is such a cessation of the usual functions of the grain elevator's mechanical equipment, by and through which *alone* there may be a proper conduct of said grain elevator business.

5. The corn of sundry owners then stored in the insured's public grain elevator at the time of the aforementioned explosion and ensuing fire on April 4, 1938, was, as the *proximate result* of such occurrence, neither turned over nor dried out for the next immediately following seven days.

6. Deterioration of said stored corn thereupon proximately resulted to the extent, in value, of $20,547.60.

7. The respective owners' claims against the insured operator of said public grain elevator aggregated the reasonable sum of $20,547.60, and the explosion with ensuing fire, was the proximate cause of the loss or damage in that amount which was sustained by the insured Board of Commissioners of the Port of New Orleans, upon its being compelled to pay, as it did, all of corn owners' damage claims aggregating said reasonable sum of $20,547.60.

8. Insurer Norwich Union Fire Insurance Society, Ltd., has all the while resisted demand for payment of said direct loss or damage so sustained by its insured, and of which due proof was made by said Board of Commissioners of the Port of New Orleans.

### Conclusions of Law.

1. The explosion, with ensuing fire, which occurred in the plaintiff's public grain elevator on April 4, 1938, was the direct, immediate and proximate cause of the loss or damage in the amount of $20,547.60 sustained by said insured, and such loss or damage was insured against with

254

defendant, Norwich Union Fire Insurance Society, Ltd.

2. The insured Board of Commissioners of the Port of New Orleans is entitled to recover from the said defendant insurer not only the amount of its said direct loss or damage, or $20,547.60, but twelve (12%) per cent. thereon, additionally, as damages for withholding payment of said proved loss, and reasonable attorney's fees, as well, for the prosecution and collection of said loss; all as prescribed by Act No. 168 of 1908, Section 3 (Dart's Louisiana General Statutes 3, § 4179, pp. 178, 179).

3. The plaintiff is moreover entitled to recover from the defendant insurer, interest at the legal rate of five (5%) per cent. per annum, until paid, on the amount of the loss sustained and the damages of 12% thereof.

4. An amount or sum of money equivalent to fifteen (15%) per cent. of the aggregate of said $20,547.60 loss, 12% thereof as damages, and interest, is reasonable as attorney's fees to be recovered by plaintiff for the prosecution and collection of its loss claim.

Let judgment be forthwith entered in accordance with the foregoing.