509 F.2d 713
 In re GULF & MIDLANDS BARGE LINE, INC., owner of the M/V
MILKA M. PELLEGRIN, praying for exoneration from
or limitation of liability, Plaintiff-Appellee.
In the Matter of ARCHIE TOWING CO., INC., owner of the M/V
RAMROD, praying for
exoneration from or limitation of liability,
Plaintiff-Appellee. UNITED STATES of America,
owner of BARGES LOX 4 and LOX 5,
Plaintiff-Appellant,
v.
The TUG RAMROD, her engines, tackle, etc., et al.,
Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
GULF COAST TOWING COMPANY, INC., et al., Defendants-Appellees.
 No. 73--3984.
 United States Court of Appeals,
Fifth Circuit.
 March 17, 1975.
 
 Gerald J. Gallinghouse, U.S. Atty., John R. Schupp, Asst. U.S. Atty., New Orleans, La., Allen Van Emmerick, Allan J. Weiss, Leonard Schaitman, Admiralty & Shipping Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.
 Theodore G. Dimitry, New Orleans, La., for Gulf & Midlands Barge Line, etc.
 Cornelius Van Dalen, New Orleans, La., for Tug Ramrod, and others.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 This case involves liability for damage to two special-purpose barges owned by the United States. The damage was incurred in a collision with a bridge when the barge was in tow, concededly caused by the negligence of the towing tugs. The owners of the tugs brought actions for limitation of liability. The United States, which had libeled one of the tugs, counterclaimed against the owners for damages of $94,000. All cases arising from the collision were consolidated for trial, and in all actions summary judgments were given for the tugs and their owners. The United States appeals, and we affirm.
 
 
 2
 In early 1966 the National Aeronautics and Space Administration sought bids on a contract for towing Saturn rocket boosters and special barges containing liquid oxygen and liquid hydrogen between the Michoud Assembly Plant in New Orleans, Louisiana, and the Mississippi Test Facility located on the East Pearl River in Mississippi. Gulf Coast Towing Company, a small owner-operated company which had a prior contract for doing similar work, was awarded the contract in May 1966 following an exchange of letters and subsequent negotiations.
 
 
 3
 In August 1966 a giant liquid oxygen tank used in Saturn test flights from Cape Kennedy, Florida, collapsed. This caused a delay in a test flight program, the losses amounting to $1,000,000 per day. In an attempt to cut losses, NASA decided to obtain additional liquid oxygen tanks for Cape Kennedy from the Mississippi Test Facility. Operating under a provision in the Gulf Coast contract concerning 'shifting service,' NASA officials procured the services of Gulf Coast[1] to tow four liquid oxygen barges from the Mississippi site to Carrabelle, Florida, the first leg of the movement to Cape Kennedy. Cape Kennedy was unable to produce other tugs for the second leg, and later for the third leg, so in conditions of high emergency Gulf Coast arranged at NASA's request to make the tow all the way to Cape Kennedy. In the words of the government's counsel, Gulf Coast 'saved NASA's bacon not once but three times.' On the return trip, however, the tugs towing two to the barges permitted them to collide with a highway bridge of the State of Florida, damaging both bridge and barges.[2] The litigation arose from this casualty.
 
 
 4
 The court below held that as a matter of law Gulf Coast was not liable even if it were negligent.
 
 
 5
 Exactly what the contract was that was applicable at the time of the casualty is not free from doubt. Despite voluminous NASA papers and records to the contrary, the U.S. denies there was any modification of the original May 1966 contract, relying solely on that contract. Considering the issues in terms of the original contract, we affirm the judgment in favor of Gulf Coast. Thus we need not consider the details of the modification, which was at least as favorable to Gulf Coast on the issue of liability, if not more so, than the May 1966 contract.
 
 
 6
 The contract in question consisted of ten pages of 'schedule articles,' a total of 15 articles drafted specifically for this particular contract. They set out the acts to be done by each party and related duties of both the towers and NASA, concerning both the conduct of the tow and the facilities to be provided. Attached to these schedule articles are some 20 pages of form contract provisions inserted by NASA into its contracts. One such form is the 'Government-furnished Property Form (October 1963),' called the Long Form, inserted into all NASA fixed- price contracts and applicable because the barges were government-furnished property. The schedule article concerning contractor's liability[3] and the relevant portion of the Long Form[4] are printed in the margin.
 
 
 7
 The District Court concluded that the government through use of this Long Form agreed to shift the risk of loss to itself. It also treated the liability provisions of Art. I.B.2(h) as inapplicable to any government-owned property, Conclusion of Law No. 7, rendering Gulf Coast free from liability under the facts of this case. We agree with the result, but arrive at it by somewhat different means.
 
 
 8
 The parties do not dispute that a tower is normally liable in tort for loss resulting from negligent acts or omissions in the course of a tow.[5] The first two questions concern whether certain provisions of this contract which were clearly intended to affect allocation of the risk of loss are applicable to the facts of this case. The government raises two subsequent questions of public policy regarding waivers of liability.
 
 
 9
 At the outset it is clear that the two provisions in question must be read in pari materia. This is so not only because of their intimate relation to common subject matter but also because the Long Form specifically provides for exceptions in the schedule, and the schedule article, drafted after the Long Form was made part of the contract, specifically refers to the Long Form.
 
 
 10
 Broadly speaking, the Long Form partially shifts the risk of loss to government property from the contractor to the government by providing that the contractor shall not be liable for loss caused by 'any peril' off the contractor's premises, and by certain listed perils when the property is on the contractor's premises. Gulf Coast asserts that 'any peril' as used in this provision includes the peril of collision, whether or not there is negligence on the part of the crew. Thus the first question is whether the loss in this case is one the risk of which was shifted to the government by this Long Form.
 
 
 11
 The Long Form provides for contractor non-liability 'except as specifically provided in the clause or clauses of this contract designated in the Schedule.' Art. I.B.2(h) is clearly such an exception because of its internal reference to the Long Form, combined with its clear placement of certain risks on the contractor. The parties do not dispute this but disagree on the meaning of the provision. Art. I.B.2(h) says Gulf Coast must indemnify the government against loss 'arising from . . . the unseaworthiness of the tug or tugs, or by deficiency in, or failure of, the equipment, machinery or personnel on board.' Gulf Coast says this provision, insofar as pertinent here, provides for indemnity for loss or liability arising only from unseaworthiness of the tugs, which is not in issue. The government insists that the language 'failure of . . . personnel on board' includes common negligence.
 
 
 12
 To carry its point that it is not liable for its negligence because the contract shifts the risk to the government, Gulf Coast must establish both points--that it otherwise is within the non-liability provision in the Long Form, and that it is not excepted from non-liability by the agreement to indemnify.
 
 
 13
 The government finally asserts two public policy arguments. First, it says that even if there is a waiver of liability, the Long Form is so ambiguous that it lacks the clarity required of such an agreement and that it must be construed strictly against the party asserting it. Second, it also says that the provision should not be enforced because it runs afoul of the public policy against waivers of liability of towers.
 
 
 14
 We hold that the Long Form did shift the risk of loss from the tug to the government even where the loss was caused in part by the negligence of the tug's crew; that the indemnity provision only provided for contractor's liability for its vessel's unseaworthiness, not its crew's negligence; that the rule of strict construction of waivers of liability is not applicable here where the party seeking to invoke it wrote the language; and that the public policy against towers' waivers of liability is not applicable under the facts of this case.
 
 I. The government-furnished property form
 
 15
 This standard addition to NASA negotiated fixed-price contracts, the Long Form, implemented NASA's policy of self-insuring for most risks because of the high cost of commercial insurance for its unusual and risky venture. NASA policy statements, published in 41 C.F.R. §§ 18--10.303 and 18--13.102--1, set out in the margin,[6] contain two interlaced features: first, NASA would assume liability for loss in the event of damage to government property, and second, NASA would self-insure, and its contractors would not include in their charges to NASA any additional charge reflecting the cost of insurance. These were the policies to be effectuated by the Long Form.
 
 
 16
 Paragraph (f)(1) of the Long Form, see footnote 4 above, provided for the contractor's non-liability for loss 'caused by any peril where the property is in transit off the Contractor's premises' and for losses on the contractor's premises caused by (A) perils listed, more or less within the Act of God rubric, and (B) perils 'customarily covered by insurance in accordance with the . . . prevailing practice in the industry in which the Contractor is engaged . . ..' Further, subparagraph (2) bars the contractor from charging the government for insurance for any of these perils.
 
 
 17
 We consider the term 'any peril' first in terms of general insurance law. The general phrase 'any peril' in (f)(1)(i) must include the Act of God and insurable perils descriptions in (f)(1)(ii)(A) and (B), since those are particular perils. Moreover, 'any peril' must be insurable perils, for otherwise the proscription in (f)(2) against procuring insurance would be nonsensical. We see no logical reason to limit this use of 'peril' to 'any peril other than the tower's negligence,' which is what the government contends we should do. Loss from one's own negligence is an obvious peril to insure against. By generally proscribing insurance for any peril the government must have meant all kinds of insurance, and concomitantly the waiver of liability must cover all kinds of liability against which that insurance was designed to protect the policyholder. Virtually any insurance which the contractor might procure would include protection against its own negligence, e.g., property damage insurance or accident insurance. For example, the policyholder's own negligence is no defense to recovery under--and hence is protected by--accident insurance policies. See, e.g., United States Mut. Acc. Assn. v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60 (1889) (death benefits policy); Zurich General Acc. & Liability Ins. Co. v. Flickinger, 33 F.2d 853 (CA4, 1929) (death resulting from drinking wood alcohol, believed to be grain alcohol, was accidental).
 
 
 18
 Considering the term 'any peril' in terms of maritime law and insurance practice, we achieve the same result.[7] 'Perils of the sea' is a well known but protean term in maritime law. For the purposes of marine insurance policies, perils of the sea includes those risks associated with the seas, including, for example, features of the sea that may cause damage directly, or indirectly through collisions, stranding and the like. It includes collision, whether the crew was negligent[8] or not.[9] As between the insurer and insured, for purposes of ascertaining the scope of the insurance policy, the negligence of the insured is no defense to recovery on the policy, unless the negligence goes to the issue of seaworthiness of the vessel. See, for example, Reisman v. N. H. Fire Ins. Co., 312 F.2d 17, 19 (CA5, 1963).[10]
 
 
 19
 The term has a distinctly different meaning when used in a bill of lading for the carrier's non-liability for perils of the sea. In that situation, the term does not include the negligence of the carrier. See e.g., Liverpool and Great Western Steam Co. v. Phenix Ins. Co., supra, note 8, and J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 588 (CA2, 1971). Finally, the term is also used in the Carriage of Goods by Sea Act (COGSA),46 U.S.C. § 1304(2)(c), and its predecessor, the Harter Act, 46 U.S.C. § 192. Carriers are not liable to shippers for damage to goods caused by perils of the sea, but that term does not include the carrier's negligence, for which there would be liability to the shipper. But only negligence in the care of the goods, not negligence in the handling of the ship, so-called errors of navigation, brings on liability. 46 U.S.C. § 1304(2)(a); R. T. Jones Lumber Co. v. Roen S.S. Co., 270 F.2d 456 (CA2, 1959). Professor Gilmore summarizes:
 
 
 20
 (P)erils of the sea . . . has the same meaning in a bill of lading or in COGSA as it has in the 'perils clause' of the marine insurance policy. The important difference is that, as a bill of lading exception, the term does not include losses caused by the carrier's negligence, or that of his agents. Law of Admiralty, § 3--32, at 139--140.
 
 
 21
 Interpretation of the clause based on bills of lading and COGSA is not apposite here where it was the customer, not the merchant marine party, who inserted the clause containing the term. This contract does not fit within the category of bills of lading in which carriers attempt to avoid liability by use of the term 'perils of the sea.' On the other hand, it is closely allied to problems of relations between insurer and insured. NASA was instructing its contractor not to procure insurance covering 'perils of the sea,' in return for NASA's agreeing to assume the risk of loss that such insurance would cover. Since Gulf Coast could have recovered under a perils clause in a marine insurance policy, its own negligence notwithstanding, it should be held free of liability where it is instructed not to procure insurance because the other party does not want to bear the insurance costs and will assume the liability not covered by insurance.
 
 
 22
 Conceding that the Long Form 'is not well suited to marine towage,' the government makes an argument to the following effect. The Long Form was intended for situations where contractors are also bailees of government property, e.g., one using a bulldozer for construction, or storing cloth to cut uniforms, or chemicals to make munitions. The Long Form relieves these contractors of their bailment liabilities, and they do not need to procure property damage insurance, which is specifically referred to in 41 C.F.R. § 18--10.303. Where the contractor is a bailee, it is clear that the Long Form waiver applies only to such bailee's liability and its complementary insurance, and not to liability for negligence and the insurance against liability for negligence. In that setting, the government theory continues, it is clear that the Long Form was not intended to be a complete waiver of liability. The use of the Long Form in the situation in this case, where there is no bailment liability, has led to confusion and error. Because the court thought that some kind of liability and insurance must be waived, and because the normal bailee's liability and property damage insurance are not present, the court has erroneously concluded that the only remaining liability--that for negligence--must have been waived.
 
 
 23
 Even accepting this explanation of the Long Form, we still think the government cannot prevail. Whatever the intended or habitual use of the Long Form, the fact remains that it was used in the present situation. It nowhere appears that Gulf Coast had any hint of the normal use of this form or the meaning attached to it by government counsel. At the very best, the government argument concedes that use of the Long Form in this case renders its meaning ambiguous. But in fact its case is even weaker, for it appears that both Gulf Coast and the government's own agent in this case gave the Long Form a meaning wholly at variance with that suggested by the government. In light of these facts, the government must tolerate the reasonable construction put on its form provision by the adverse party. One who supplies form contractual provisions in circumstances like the present case must tolerate a reasonable construction against it. See the discussion below in Part III.
 
 II. The schedule articles
 
 24
 Subparagraph (f)(1) of the Long Form provides two exceptions to the government's assumption of the risk of loss to its property. The exception relevant here provides that the waiver of liability applies 'except as specifically provided in the clause or clauses of this contract designated in the Schedule . . .', supra, note 4. The clause of the schedule in question, Art. I.B.2(h), supra, note 3, requires Gulf Coast to fit out and maintain the tugs properly and to indemnify the government against loss due to unseaworthiness of the tug or 'by deficiency in, or failure of, the equipment, machinery or personnel on board.'
 
 
 25
 The issue is whether the agreement to indemnify described above, I.B.2(h), refers only to seaworthiness of the tug, or whether by reason of the phrase 'failure of . . . personnel' there is also an understanding to indemnify for losses due to the negligence of the crew as well.
 
 
 26
 The factors listed in this indemnification provision all relate to matters normally considered elements of seaworthiness. Seaworthiness in marine insurance contracts means
 
 
 27
 that the materials of which the ship is made, its construction, the qualifications of the captain, the number and description of the crew, the tackle, sails, the rigging, stores, equipment, and outfit, generally, are such as to render it in every respect fit for the proposed voyage or service. (Emphasis added.)
 
 
 28
 Buglass, Marine Insurance and General Average in the United States, 20--21 (1973). Having a full complement of crew members all of whom are trained and competent is as much a part of seaworthiness as having a sound vessel. Aguirre v. Citizens Cas. Co. of N.Y., 441 F.2d 141 (CA5), cert. denied 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The words used in Art. I.B.2(h) described exactly what, besides the vessel itself, is included in the implied warranty of seaworthiness given by insureds to their marine insurers. We think the additional disjunctive phrase is properly read as intended by the parties to make explicit what is normally only implied in seaworthiness provisions.[11] With regard to the government property in the tow of Gulf Coast, NASA was in a position much like that of an insurer of the cargo of a vessel or of a general insurer of a tug. We agree with Gulf Coast that NASA, as a self-insurer, would naturally require a warranty of seaworthiness just as a marine insurer would require such warranty from its insured.
 
 
 29
 Any other interpretation would produce serious anomalies in this contract, besides straining at the meaning of words. To construe this clause as including common negligence would permit the Schedule article exception to the government-insured property clause to swallow up the general rule of paragraph (f)(1). Moreover, to attach to this language the meaning of negligence when such well understood terms as 'negligence' itself or 'errors in navigation' were available is to reward obscurity and confound the reasonable expectations of those reading contractual terms. If negligence is what the government meant, it should have said so.
 
 III. The requirement of clarity in waivers
 
 30
 We are not persuaded by the government's argument that it should prevail because the agreement does not meet the standard that an agreement to shift the burden of loss must be clearly and unambiguously expressed. At the outset, the provisions in question do not, as the government suggests, benefit only the tower. NASA did not insist on using its Long Form out of magnanimity, nor was it forced on an unwilling NASA by an overbearing, powerful, private towing concern. NASA knew that the cost of insuring its special and expensive equipment with commercial insurers, whether through its contractors or directly by the government itself, would be high and that bidders would include the cost in their bids. By waiving the contractors' liability and prohibiting the charging of insurance premiums, NASA benefitted by reducing its direct costs.
 
 
 31
 The demand for clarity is puzzling, coming as it does from the party that supplied the terms. Gulf Coast did offer an 'understanding' in its original response to NASA's request for bids unambiguously to the effect that the government assumed 'all liability for loss of, and/or damage to Government-owned Property.' It is not clear from the negotiations whether Gulf Coast expected its exact language to be incorporated into the contract. It is clear that the government contracting officer thought such language was unnecessary. He said in a deposition that contractors would be liable for damage to government property only if there were willful misconduct or the involvement of 'some high official of the company.'
 
 
 32
 The government's policy argument conflicts with a directly contrary policy of construing contractual language against the party that supplied the language. This doctrine has been applied against the government many times,[12] and although no case in which the government was involved appears to have raised the issue in this circuit, it has been applied by this court in suits between private parties.[13] For the most part, those cases concerned contractual terms capable of two equally logical meanings. We are not faced here with such precise ambiguity, but we think the policy is appropriate where the ambiguity is in a standard form required by the government. At the very least, where a provision of a contract benefits both parties, one party cannot rely on a policy of construing such terms strictly in its favor where it supplied and insisted upon the very terms that are ambiguous.IV. Application of the Bisso-Dixilyn[14] doctrine
 
 
 33
 Bisso-Dixilyn proscribes as against public policy contracts by which towers are exculpated from liability for their own negligence. The basis for the policy was the fear of overreaching by the towing industry of those in need of its services.[15] A small, owner-operated company like Gulf Coast could hardly overreach the United States government, and it is clear no overreaching occurred. Gulf Coast was one of three companies that responded to NASA's request for bids, and presumably it was selected because it offered to perform the required work at the lowest price.
 
 
 34
 Even if Gulf Coast were not without market power, Bisso-Dixilyn would not apply here for two other related reasons. First, we have permitted parties to make their own agreements as to which shall bear the cost of insurance.[16] Most recently, we have held that the parties may provide by contract that each party must (1) procure insurance to protect against his own loss; (2) make the other an assured under the other party's insurance policy; and (3) require its insurer to waive its subrogation rights against the other party.[17] We think the United States was doing the same thing in the contract in this case. Its self-insurance program and the prohibition against the contractor's procuring insurance for 'excepted perils' were part of an agreement as to who should procure insurance. Because the government elected to be self-insured, its waiver of the contractor's liability was analytically identical to, and served the same function as, an agreement of one party to require its insurer to waive subrogation rights against the other party. Indeed, with one party self-insuring, this result could be achieved in no other way.
 
 
 35
 Second, where the waiver of liability is forced on the tower pursuant to a well established, prior policy of the other party, application of Bisso-Dixilyn would be grossly unfair. Especially is this so where the other party is the government and where it forbids its towing contractors to procure insurance to protect themselves. Barring the shifting of liability would render ineffectual NASA's attempt to reduce its insurance costs by its program of self-insurance. Bisso-Dixilyn should not have that effect.
 
 
 36
 In summary, we think the Government-furnished Property Form, the Long Form, was intended to shift from contractor to government the risk of loss to such property in the contractor's possession, whether such loss arose from the negligence of the contractor or some external source, so long as the loss was one that might have been insured against. The indemnity agreement did not operate as an exception to the non-liability provision except where unseaworthiness was the cause of the loss. Finally, no judicially-developed public policy should prevent the United States from assuming liability where it chooses to do so with its eyes wide open.
 
 
 37
 Affirmed.
 
 
 
 [1]
 A second company owned by the same individual who owns Gulf Coast and a third company were also involved in this arrangement. They are parties here, and their positions are the same in this appeal. They will be referred to collectively as Gulf Coast
 
 
 [2]
 The State made a claim in Gulf Coast's limitation action, and their dispute has been settled. The issue between Florida and the tugs is substantially different from that between the United States and the tugs
 
 
 [3]
 The schedule contained 15 articles, only the first of which is pertinent. It was entitled 'Scope of Work,' and had five subheadings: (A) General; (B) Operations; (C) Schedule of Trips; (D) Contractor Personnel; and (E) General Requirements. The 'Operation' subheading had two sections; one simply defined the endpoints of the tows and required the contractor to use a 'reasonable' speed that 'shall not be such as to endanger the tow.' The second section, Art. I.B.2, provided:
 'The contractor shall perform all tows in accordance with Exhibit C, Method of Tow, subject to the following provisions
 (h) The contractor shall fit out and maintain the tugs in a proper and sufficient manner in all respects and shall indemnify the government against any and all loss, damage, or liability arising from or attributable to, the unseaworthiness of the tug or tugs, or by deficiency in, or failure of, the equipment, machinery or personnel on board. For the purposes of this contract the term 'government-furnished property' as used in the government-furnished property (Long Form) (Oct. 1963) form attached to this contract is deemed to include any and all cargo and/or equipment carried, which has been carried, or is to be carried aboard government furnished barges.' (Emphasis added.)
 The language emphasized is that upon which the government relies in asserting that this provision includes a promise to indemnify for loss due to the negligence of the tug's crew.
 
 
 [4]
 The sixth paragraph of the Long Form provides:
 '(f) (1) Except for loss, destruction or damage resulting from a failure of the Contractor due to willful misconduct or lack of good faith of any of the Contractor's managerial personnel as defined herein, to maintain and administer the program for the maintenance, repair, protection and preservation of the Government-furnished Property, as required by Paragraph (e) hereof, and except as specifically provided in the clause or clauses of this contract designated in the Schedule, the Contractor shall not be liable for loss or destruction of or damage to the Government-furnished Property--
 (i) caused by any peril where the property is in transit off the Contractor's premises, or
 (ii) caused by any of the following perils while the property is on Contractor's or subcontractor's premises, or on any other premises where such property may properly be located, or by removal therefrom because of any of the following perils:
 (A) Fire, lightning, windstorm, cyclone, tornado (and like perils) . . .; or
 (B) Other peril, of a type not listed above, if such other peril is customarily covered by insurance (or by a program of self-insurance) in accordance with the normal practice of the Contractor, or the prevailing practice in the industry in which the Contractor is engaged with respect to similar property in the same general locale.
 The perils as set forth in (i) and (ii) above, are hereinafter called 'excepted perils.'
 (2) The Contractor represents that he is not including in the price hereunder, and agrees that he will not hereafter include in any price to the Government, any charge or reserve for insurance (including self-insurance funds or reserve) covering loss or destruction of or damage to the Government-furnished Property caused by any excepted peril.'
 
 
 [5]
 Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); New Orleans Coal & Bisso Towboat Co. v. Texas Co., 122 F.2d 141 (CA5, 1941); Dameron-White Co. v. Angola Transfer Co., 19 F.2d 12 (CA5, 1927); Offshore Co. v. G & H Offshore Towing Co., 262 F.Supp. 282, collecting cases at 286 (S.D.Tex., 1966)
 
 
 [6]
 41 C.F.R. § 18--10.303:
 'NASA's policy with respect to Government assumption for risk of loss of or damage to Government property in the possession of contractors is set forth in § 18--13.102. This policy is implemented by the Government property clauses set forth in Subpart 18--13.7. . . . Except for contracts . . . where contractor responsibility for risk of loss or damage would not result in the inclusion of contingency charges in the contract, it is NASA's policy to assume the risk of loss or damage. This policy is based on the principle that it is less costly for the Government to act as a self-insurer than to permit the contractor to take out property damage insurance . . .'
 
 
 [41]
 C.F.R. § 18--13.102--1:
 'It is NASA policy not to hold a contractor responsible for loss or damage to Government property caused by certain perils when such Government property is provided under:
 (b) A negotiated fixed-price type procurement contract for which the price is not based on (1) adequate price competition, (2) established catalog or market prices of commercial items sold in substantial quantities to the general public . . . or (3) prices set by law or regulation . . .'
 
 
 [7]
 Adherence to maritime insurance practice is appropriate here because the Long Form itself refers to perils 'customarily covered by insurance . . . in accordance with . . . the prevailing practice in the industry in which the Contractor is engaged . . ..' Although this language occurs in paragraph (f)(1) (ii)(B) regarding on-premises perils, it is clear that the 'any peril' of (f)(1) (i) must encompass all the particular perils of (f)(1)(ii)(A) and (B)
 
 
 [8]
 Liverpool and Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 438, 9 S.Ct. 469, 470, 32 L.Ed. 788, 791 (1889)
 
 
 [9]
 Peters v. Warren Ins. Co., 39 U.S. (14 Pet.) 99, 108, 10 L.Ed. 371, 376--377 (1840); American-Hawaiian S.S. Co. v. Bennett & Goodall, 207 F. 510, 514 (CA9, 1913)
 
 
 [10]
 Cf. Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., Inc., 247 F.2d 116 (CA5), cert. denied 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957), where it was held that even unseaworthiness was covered by an 'Inchmaree Clause.'
 
 
 [11]
 The provision, supra, note 3, requires the contractor to indemnify the government for liability or loss 'arising from or attributable to, the unseaworthiness of the tug or tugs, OR by deficiency in, or failure of, the equipment, machinery or personnel on board.' (Emphasis added.) To read the 'by deficiency in (etc.)' phrase as a disjunctive clause adding additional liabilities leaves a wide overlap, for no interpretation of 'deficiency in, or failure of, the equipment (or) machinery' could add anything that is not already implied in seaworthiness. We think it more plausible that the parties intended to make specific what was implied by the term 'unseaworthiness' rather than that they intended to add some new liability and fortuitously employed language that looks strikingly like the implied warranty of seaworthiness in most of its features
 
 
 [12]
 See, e.g., Garrison v. United States, 74 U.S. (7 Wall.) 688, 19 L.Ed. 277 (1869); Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 195 Ct.Cl. 21 (1971); Kenneth Reed Construction Corp. v. United States, 475 F.2d 583, 201 Ct.Cl. 282 (1973). (Cases are listed in Modern Federal Practice, Contracts § 155.)
 
 
 [13]
 Boyd Construction Co. v. T. L. James & Co., 477 F.2d 34 (CA5, 1973); W. C. Shepherd Co. v. Royal Indemnity Co., 192 F.2d 710 (CA5, 1951)
 
 
 [14]
 Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955); Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963)
 
 
 [15]
 Bisso, supra, 349 U.S. at 91, 75 S.Ct. at 632, 99 L.Ed. at 918; Fluor Western Inc. v. G & H Offshore Towing Co., 447 F.2d 35, at 38 (CA5, 1971)
 
 
 [16]
 Fluor Western Inc. v. G & H Offshore Towing Co., supra, note 14. See also In re Port Everglades Towing Co., 454 F.2d 276 (CA5, 1972); Slade, Inc. v. Samson Towing Co., 327 F.Supp. 555 (E.D.Tex., 1970)
 
 
 [17]
 Twenty Grand Offshore, Inc. v. West India Carriers, Inc., 492 F.2d 679 (CA5, 1974)